# Exhibit 7

# Exhibit 7

Many of the inaccuracies discussed herein were identified during the July 6, 2020 deposition of Deborah Wensink, the administrator of SIASC.  Excerpts of the rough draft of Ms. Wensink's deposition are attached hereto as <u>Attachment A</u>.  Ms. Wensink is the custodian of records for SIASC.  (Wensink Dep. 12:11-13.)  In her job she participates in SIASC's financial and cost containment decisions (18:4-8); to ensure that SIASC meets federal and state rules and regulations (18:9-14); to serve as their internal risk manager (18:15-17); to oversee the environment of care, personnel, materials and equipment and coordinate direct patient care (18:18-19:4).  She is responsible for arranging and contracting with service providers (19:22-20:1); overseeing the business office functions and monitoring payroll and benefits (20:2-9).  She is involved in developing the capital budgets for SIASC in consultation with its board (20:10-17.)  In short, Ms. Wensink is intimately involved with all aspects of SIASC's operations.

| ROG/RFP | Request | SIASC Amended Response | Inconsistencies |
|---|---|---|---|
| ROG 3 | "State the total value of all unpaid accounts receivable owed to [SIASC]." | "SIASC does not have any unpaid accounts. SIASC does not have any accounts receivable documents in its possession and/or control." | It is impossible for SIASC to have zero accounts receivable if the following, testified to by Ms. Wensink on July 6, 2020, are true:<br><br>"Q.   Does [SIASC] still maintain payor contracts with the same insurance providers it did on December of 2018?  A.   I don't believe there has been any changes." (Wensink Dep. 40:14-18.)<br><br>"Q.   Okay.  So some payors still want you to use Southern Idaho Ambulatory Surgery Center, is that right?  A.   Yes, because they don't -- yes, because they haven't gotten things transferred and they don't care." (Wensink Dep. 46:19-24.)<br><br>"Q.   And you will still do that, you still bill them under [SIASC] like they ask you to?  A.   Yes." (Wensink Dep. 47:2-5.) |
| ROG 4 | "Identify all illiquid assets currently owned by [SIASC] and state the nature and value of each such asset." | "The asset schedule produced by Twin Falls NSC prior to the underlying arbitration identifies the non-liquid assets owned by SIASC. The list was out-of-date and contained numerous inaccuracies at the time it was received from Twin Falls NSC. However, the equipment that was accurately inventoried remains in place at the Sawtooth Surgery Center facility. See Response to Request for Production No. 12, below." | It is clear from both SIASC's response and Ms. Wensink's testimony that SIASC did not, in any meaningful way, attempt to answer this interrogatory.<br><br>"Q.   What does SIASC currently own for illiquid assets?<br>A.   I don't know.<br>Q.   How would you find out?<br>A.   I would have to ask Dr. Doble.<br>Q.   You would expect Dr. Doble to know?<br>A.   At least to be able to categorize what you would be talking about.<br>Q.   Would another way be to go around and look and write things down and just say, okay, there is XYZ machine and here is some supplies and just write it all down, would that be a way to do it?<br>*********** |

| ROG/RFP | Request | SIASC Amended Response | Inconsistencies |
|---|---|---|---|
| | | | A.   That would give us an inventory of what was exactly here, but what you are talking about SIASC versus The Surgery Center, that's the no.<br>Q.   … Did SIASC transfer its assets to The Surgery Center or any of them?<br>A.   I don't know.<br>Q.   But in answering this interrogatory you could have found out, right?<br>A.   Probably.<br>Q.   But you didn't do that?<br>A.   No." (Wensink Dep. 89:9-90:9.) |
| ROG 6 | "State the amount and nature of all loans or other debts, including all accounts payable, currently owed by [SIASC] and state the purpose, amount and due dates of any payment obligations relating to those loans/debts." | "None." | This is unquestionably incorrect, as SIASC has, at the very least, the debt it owes to Twin Falls, as confirmed by the District Court. *See* Dkts. 32-33. |
| ROG 7 | "To the extent not identified in the preceding interrogatory, please state the nature and amount of each of [SIASC]'s current liabilities." | "None." | This is incorrect for the same reason for the same reason as those explained in response to Interrogatory 6, above. |
| ROG 8 | "Identify each and every bank account maintained by or for [SIASC] since January 1, 2018. In your response, please specify the location, financial institution, account number and current balance of each such account." | "None." | Ms. Wensink admitted in her deposition that this response is false:<br><br>"Q.   Ms. Wensink, as you sit here right now you know that SIASC had a bank account in 2018, do you not?<br>A.   Yes.<br>Q.   So did you know that the answer to Interrogatory No. 8 is false, it says that you didn't have one, right?<br>A.   Let me -- I see what you are saying, I hear what you are saying." (Wensink Dep. 94:25-95:8.) |
| ROG 9 | "Identify all persons who have knowledge of [SIASC]'s financial condition since January 1, 2018, including its assets, liabilities, distributions, earnings and/or expenses." | "Debbie Wensink, Administrator H. Peter Doble, II, Medical Director" | It quickly became clear in Ms. Wensink's deposition that SIASC's response to Interrogatory No. 9 is incomplete.<br><br>"Q.  And you list yourself and Dr. Doble.  Is that a complete answer?<br>A.   I should have put the accountant on there, but I didn't think of it at the time. |

| ROG/RFP | Request | SIASC Amended Response | Inconsistencies |
|---|---|---|---|
| | | | Q.   Okay.  Is there anybody else that should be added to that list who would have knowledge of SIASC's financial condition since January 1, 2018? Like D.L. Evans, for example. A.   I don't know what D.L. Evans knows. ***** Q.   Anybody else that should be added to that to make that a complete response like Dr. Kack or the members of the board of directors? A.   The rest of the board. Q.   [T]he board of SIASC would have knowledge responsive to interrogatory nine and the members of SIASC would have knowledge responsive to interrogatory number nine, right? A.   Yes." (Wensink Dep. 95:10-18; 95:23-96:10.) |
| ROG 12 | "Identify each person or entity who currently holds any membership interest in [SIASC] and state the membership percentage owned by of each such person or entity." | "The Surgery Center, PLLC 100%" | Ms. Wensink, as the administrator and custodian of records for SIASC, testified that the members of SIASC did not include The Surgery Center, PLLC. "Q.   Who are the members of [SIASC] today? A.   Dr. Doble, Dr. Christensen, Dr. May, Dr. Kack, and I don't know whether Dr. Welch is still on there or not.  I think he is." (Wensink Dep. 34:22-25.) |
| ROG 13 | "Identify each person or entity who held membership interests in [SIASC] at any point since January 1, 2018 but is no longer a member of [SIASC]." | "None." | In the underlying arbitration, Dr. Doble testified that he was, on September 7, 2018, a member of [SIASC]: "Q.   Dr. Doble, you are a member of Southern Idaho Ambulatory Surgery Center at this moment in time. Is that correct?  A.   That is correct." (Attachment B, Arb. Tr. 46:14-18.) If, in fact, the prior interrogatory response is true that The Surgery Center, PLLC is the only member of SIASC, then at some point Dr. Doble must have transferred or otherwise disposed of his membership. Ms. Wensink acknowledged in her deposition that she did not make a good faith attempt to respond to this interrogatory. "Q.   [Y]ou told me in the preceding interrogatory that The Surgery Center PLLC is now the 100% owner.  If those things are true then |

| ROG/RFP | Request | SIASC Amended Response | Inconsistencies |
|---------|---------|------------------------|-----------------|
| | | | you would agree with me that there are in fact persons or entities who previously held interests in [SIASC] that are no longer members, right? A. Would I agree to that, no, because it is very confusing and I would need to see something … Q. Okay. What would you need to see? A. Something that explained it to me. Q. Did you look for something that explained it to you? A. No." (Wensink Dep. 99:5-18.) |
| ROG 14 | "Identify each person who has served as an accountant, auditor or bookkeeper for [SIASC] since January 1, 2018." | "Debbie Wensink" | Ms. Wensink acknowledged this response was incomplete: "Q. And Mr. Sparr was an accountant for SIASC since January 1, 2018, right? A. Yes." (Wensink Dep. 101:7-9.) |
| RFP 3 | "Produce all account statements for any bank account in which [SIASC] has, or has had, any funds since January 1, 2018." | "SIASC has maintained no bank accounts since January 1, 2018." | Ms. Wensink admitted that this response was false: "Q. Ms. Wensink, as you sit here right now you know that SIASC had a bank account in 2018, do you not? A. Yes." (Wensink Dep. 93:25-94:2.) |
| RFP 4 | "Produce all documents that relate in any way to any contracts or other agreements, either written or oral, to which [SIASC] has been a party since January 1, 2018." | "None." | Ms. Wensink admitted that this response was false: "Q. SIASC would have had a lease agreement, right? A. Yes." (Wensink Dep. 105:1-5.) Once SIASC supplements their production to include missing documents, it should be required to provide a sworn verification that all responsive documents have been produced. |
| RFP 6 | "Produce all minutes, notes, or other documents reflecting or relating to any meetings of the members of [SIASC] since January 1, 2018." (RFP 5.); "Produce all minutes, notes, or other documents reflecting or relating to any meetings of the board and/or other governing body of [SIASC] since January 1, 2018." | "None." | Ms. Wensink acknowledged that there have been board meetings during the requested period and that SIASC had board minutes of those meetings. "Q. Do you know if there has been a board meeting within the last six months? A. Yes." (Wensink Dep. 37:15-17.) "Q. Do you believe that southern Idaho ambulatory surgery center keeps accurate records? A. Yes. Q. Are they complete? |

| ROG/RFP | Request | SIASC Amended Response | Inconsistencies |
|---------|---------|------------------------|-----------------|
|  |  |  | A.   Yes.<br>Q.   So there is no reason to believe that you wouldn't have copies of the board minutes for every board meeting, right?<br>A.   Correct."  (Wensink Dep. 38:11-20.)<br><br>Once SIASC supplements their production to include missing documents, it should be required to provide a sworn verification that all responsive documents have been produced. |
| RFP 8 | "Produce all agreements entered into since January 1, 2018 between or among the members of [SIASC], or any of them." | "None." | Ms. Wensink admitted that she did not attempt to respond to this Request.<br><br>"Q.   Did you look for agreements entered into between the members of SIASC?<br>A.   No."  (Wensink Dep. 106:2-4.)<br><br>Once SIASC supplements their production to include missing documents, it should be required to provide a sworn verification that all responsive documents have been produced. |
| RFP 12 | "Produce an inventory of all assets owned by [SIASC]." | "An asset list has already been produced and reflects the assets owned by SIASC to the extent that it is accurate. No assets of the asset list that were accurately listed (i.e., actually owned and in the possession of SIASC) have been sold since December 26, 2017. However, a few items that were beyond repair, such as one colonoscope, has been disposed of. See also Response to Interrogatory No. 4." | As with response to Interrogatory No. 4, it is clear that SIASC did not, in any meaningful way, attempt to answer this Request.<br><br>"Q.   What does SIASC currently own for illiquid assets?<br>A.   I don't know.<br>Q.   How would you find out?<br>A.   I would have to ask Dr. Doble.<br>Q.   You would expect Dr. Doble to know?<br>A.   At least to be able to categorize what you would be talking about." (Wensink Dep. 89:9-15.)<br><br>Once SIASC supplements their production to include missing documents, it should be required to provide a sworn verification that all responsive documents have been produced. |
| RFP 13 | "Produce all documents that relate in any way to the sale or other disposition of any of [SIASC]'s assets since January 1, 2018." | "No assets of SIASC have been sold since January 1, 2018." | Based on Ms. Wensink's deposition testimony, this response appears to be false.<br><br>"Q.   So what you are telling me, if I understand correctly, and I do want to get this right so let me just make sure, what you are telling me is TSC owns everything now, right, today?<br>A.   Yes. |

| ROG/RFP | Request | SIASC Amended Response | Inconsistencies |
|---------|---------|------------------------|-----------------|
| | | | Q.   And before TSC, SIASC owned whatever assets it had, equipment, supplies, leasehold interests, those sorts of things, right? A.   Yes."  (Wensink Dep. 108:18-110:1.) |
| RFP 16 | "Produce all unaudited financial statements prepared for [SIASC] since January 1, 2018." | "SIASC is in the process of assembling and verifying the accuracy of a balance sheet and income statement for 2018, 2019, and 2020 (year-to-date), intended to represent the assets described above and the debts of SIASC. As soon as it is available, it will be produced. Production is anticipated to occur by Friday, June 26, 2020." | This is nonresponsive to the Request, which seeks all documents rather than a compilation.  Ms. Wensink admitted that she did not attempt to obtain responsive documents, which she could have accessed by requesting copies from SIASC's accountant.  (*See* Inconsistencies with RFP 1, discussed at p4.) |

# Attachment A

Wensink Deborah 070620 ROUGH DRAFT

1

```
 1        Reporter's Name:  STEPHANIE A. BATTAGLIA
          --------------------------------------------------
 2        REALTIME/INTERACTIVE ROUGH DRAFT TRANSCRIPT
                            AND/OR
 3          UNCERTIFIED REALTIME ASCII DISCLAIMER
          --------------------------------------------------
 4                     IMPORTANT NOTICE
                   - AGREEMENT OF PARTIES -
 5
       PROCEEDING BEYOND THIS PAGE CONSTITUTES ACCEPTANCE OF
 6      AND AGREEMENT WITH THE FOLLOWING TERMS AND CONDITIONS
          --------------------------------------------------
 7
        We, the party working with realtime and rough draft
 8      transcript and/or ASCII disks, understand that if we
        choose to use the realtime rough draft screen, the
 9      rough printout, or the unedited ASCII disk, that we
        are doing so with the understanding that all rough
10      drafts are uncertified copies and...

11         WE AGREE THEY WILL BE BILLED TO AND PAID FOR BY US

12      We further agree not to comment in the record on,
        share, give, copy, scan, fax or in any way distribute
13      this realtime rough draft or ASCII in any form
        (written or computerized) to any party.  However, our
14      own experts, co-counsel, and staff may have limited
        internal use of same with the understanding that we
15      agree to destroy our realtime rough drafts and/or any
        computerized form, if any, and replace it with the
16      final transcript/ASCII disk upon its completion.

17                       REPORTER'S NOTE:

18      Since this deposition has been recorded by me in
        realtime and is in rough draft form, please be aware
19      that there may be discrepancies regarding page and
        line number when comparing the realtime screen, the
20      rough draft/uncertified transcript, rough
        draft/uncertified ASCII disk, and the final
21      transcript/ASCII disk.

22      Also, please be aware that the realtime screen and the
```

Page 1

Wensink Deborah 070620 ROUGH DRAFT

14    deponent I guess.

15              I am going to go shut my door a minute so

16    I will be away from the field one second, okay?

17              VIDEOGRAPHER PIETANZA:  The court

18    reporter today is Stephanie Battaglia representing

19    Planet Depos.

20              Will the reporter please swear in the

21    witness.

22                      DEBORAH WENSINK,

23    called as a witness herein, having been first duly

24    sworn was examined and testified as follows:

25                      EXAMINATION

                                                        5

1                      BY MR. BALDWIN:

2         Q.    Good morning, you are Deborah Arlene

3    Wensink, correct?

4         A.    Yes.

5         Q.    You are the center administrator for

6    Southern Idaho Ambulatory Surgery Center of Sawtooth?

7         A.    Yes.

8         Q.    I will refer to Southern Idaho Ambulatory

9    Surgery Center as either SIASC or Sawtooth, do you

10   understand what I am talking about, right?

Wensink Deborah 070620 ROUGH DRAFT

20    you might know that?

21          A.    I don't know what they -- I don't know

22    what the board members do.

23          Q.    Okay.

24                To your knowledge is Southern Idaho

25    Ambulatory Surgery Center party to a joint

                                                    11

1     representation agreement with anyone?

2           A.    I don't know.

3           Q.    And you are the custodian of records for

4     Southern Idaho Ambulatory Surgery Center, right?

5           A.    Some records, yes.

6           Q.    You are the custodian of some records but

7     not all?

8           A.    I have what I have.  I don't know what I

9     don't have.

10          Q.    Sure.

11                But you are the custodian of records for

12    Southern Idaho Ambulatory Surgery Center, right?

13          A.    Yes, I guess.  -- yes.

14          Q.    Well, are you unsure about it?  You

15    testified that you were in August of 2018.  Has that

16    changed?

Wensink Deborah 070620 ROUGH DRAFT

23          A.     On any given day there is lots of things

24    I have to do.

25          Q.     Well, maybe I can help you with them a

18

1     little bit.  I am looking at your job description, we

2     talked about in August of 2018, and you just told me

3     that things have not changed but let's make sure about

4     that.  One of the things that is within your job

5     description is to participate in financial and cost

6     containment decisions for Southern Idaho Ambulatory

7     Surgery Center, is that correct?

8          A.     Yes.

9          Q.     Another thing is that you are -- part of

10    your job description is to ensure that the center

11    meets all related local state federal and accredited

12    body rules and regulations, is that still part of your

13    job description?

14          A.     Yes.

15          Q.     You serve as the internal risk manager.

16    Is that still part of your job description?

17          A.     Yes.

18          Q.     You are responsible for management of all

19    aspects of environment of care, personnel, materials

Page 20

Wensink Deborah 070620 ROUGH DRAFT

20    and equipment and administrative duties, is that still

21    part of your job description?

22         A.    Yes, I oversee -- I don't do every single

23    thing all alone.  I oversee the people who do.

24         Q.    You coordinate and direct patient care at

25    the surgery center, is that true?

19

1          A.    I have charge nurses that actually

2     coordinate it themselves.

3          Q.    Okay.  So you don't do that any more?

4          A.    I oversee them.

5          Q.    Okay.

6               MR. ROSA:  Counsel, what document are you

7     referring to so that we are clear?

8               MR. BALDWIN:  Well, I am referring to an

9     exhibit from the prior deposition and I am just

10    reading off, it is her job description for the center

11    that we talked about in August of 2018 and I want to

12    make sure that this job description is still accurate.

13              MR. ROSA:  I understand.  Is there an

14    exhibit number attached to it so I can understand what

15    is --

16              MR. BALDWIN:  No.

Wensink Deborah 070620 ROUGH DRAFT

17              MR. ROSA:  Not from the prior deposition

18   either?

19              MR. BALDWIN:  There may be.  I don't have

20   it.

21   BY MR. BALDWIN:

22         Q.    Ms. Wensink, are you still responsible

23   for arranging and contracting with service providers,

24   for example, pathology, radiology, and housekeeping?

25         A.    Yes, to a degree.  The board has to

                                                    20

1    approve them.

2          Q.    Do you still oversee the business office

3    functions?

4          A.    Yes.

5          Q.    Do you still monitor payroll and benefits

6    for Sawtooth?

7          A.    Payroll and what?

8          Q.    Benefits.

9          A.    Oh, yes.

10         Q.    You still develop and implement capital

11   and operating budgets for Sawtooth?

12         A.    The board basically does that.

13         Q.    So you don't have any role in the capital

Wensink Deborah 070620 ROUGH DRAFT

14   or operating budgets for Sawtooth?

15        A.    I make suggestions.

16        Q.    In consultation with the board?

17        A.    Yes.

18        Q.    But you are familiar with those capital

19   and operating budgets then?

20        A.    Yes.

21        Q.    You still audit the accounts receivable

22   and accounts payable for Sawtooth?

23        A.    I still audit them you said?

24        Q.    Yes.

25        A.    Yes.

                                                      21

1         Q.    You still coordinate the purchasing of

2    equipment and supplies for Sawtooth?

3         A.    I don't do it myself, someone else does,

4    the purchasing person does that.  I oversee her, I

5    mean, we discuss it.

6         Q.    All right.  You still negotiate managed

7    care contracts for Sawtooth?

8         A.    If the need were to arise, yes.

9         Q.    You still involved in employing personnel

10   for Sawtooth?

                        Page 23

Wensink Deborah 070620 ROUGH DRAFT

20      Q.    Is that a no?

21      A.    Correct, that is a no.

22      Q.    Who are the members of Sawtooth today?

23      A.    Dr. Doble, Dr. Christensen, Dr. May, Dr.

24   Kack, and I don't know whether Dr. Welch is still on

25   there or not.  I think he is.

                                                          35


1        Q.    I think I missed one, you said Dr. Doble,

2    Kack, Christensen and maybe Welch, who else?

3        A.    May, William May.

4        Q.    Who is on the board of Sawtooth today?

5        A.    The same physicians.

6        Q.    Who was -- who were the owners of

7    Sawtooth on January 1, 2018?

8        A.    Those same physicians.

9        Q.    Including for sure Dr. Welch?

10       A.    Correct.

11       Q.    Has an entity called The Surgery Center,

12   which I will refer to as TSC, has TSC become a member

13   of Sawtooth?

14       A.    I don't know that.  I don't know.

15       Q.    Are you familiar with an entity known as

16   The Surgery Center PLLC?

Wensink Deborah 070620 ROUGH DRAFT

17          A.    Yes.

18          Q.    And -- but you don't know if it has

19    become a member of Sawtooth?

20          A.    No.

21          Q.    I will ask you some more about that in a

22    minute.

23                Who is the medical director of Sawtooth

24    today?

25          A.    Dr. Doble.


                                                        36


1           Q.    Who is the managing member?

2           A.    Dr. Doble, I guess.

3           Q.    Just to be clear, Sawtooth is a manager

4     managed LLC, right?  I mean Dr. Doble is the manager?

5                 MR. ROSA:  I am going to object on the

6     grounds it calls for a legal conclusion.

7     BY MR. BALDWIN:

8           Q.    You can answer.

9           A.    I don't know because I don't know what

10    that means when you say it that way.

11          Q.    Let me ask you this.  In August of 2018

12    you told me Dr. Doble was the manager of Sawtooth in

13    deposition under oath.  Has that changed to your

                          Page 40

Wensink Deborah 070620 ROUGH DRAFT

14    knowledge?

15          A.    Not to my knowledge.

16          Q.    Do you know how Dr. Doble was selected to

17    be the manager of Sawtooth?

18          A.    No, I don't.

19          Q.    Do you know when he became the manager

20    for Sawtooth?

21          A.    No, I don't.

22          Q.    How often does the board meet?

23          A.    It varies.  Monthly --

24          Q.    What was the -- I am sorry?

25          A.    It varies.  It depends on what they need

37

1    to talk about.

2          Q.    Did you say -- so either monthly or

3    quarterly?

4          A.    Yes, sometimes weekly, I am assuming.

5          Q.    When was the last meeting of the board of

6    directors of Sawtooth?

7          A.    I don't know that.

8          Q.    As the center administrator do you attend

9    at least on occasion the board meetings of Sawtooth?

10          A.    Occasionally, yes.

Page 41

Wensink Deborah 070620 ROUGH DRAFT

11        Q.      When was the last one you attended?

12        A.      I do not recall the date.

13        Q.      Was it within the last six months?

14        A.      No.

15        Q.      Do you know if there has been a board

16   meeting within the last six months?

17        A.      Yes.

18        Q.      Are you responsible for sending out

19   notices of the board meetings?

20        A.      Not always.

21        Q.      Who is?

22        A.      I don't know that.

23        Q.      If you wanted to know that where would

24   you look?

25        A.      I would ask Dr. Doble.

                                                        38

1         Q.      Who keeps the minutes of the board

2    meetings?

3         A.      Dr. Doble or my -- if I am there it's me.

4         Q.      And you are the custodian of records, do

5    you file and maintain those board meeting minutes?

6         A.      The ones that I have.

7         Q.      So if you wanted to know when the last

Wensink Deborah 070620 ROUGH DRAFT

8     board meeting was you could look for the minutes that

9     you have on file, right?

10          A.    Yes.

11          Q.    You said the ones that you have.  Do you

12    believe that southern Idaho ambulatory surgery center

13    keeps accurate records?

14          A.    Yes.

15          Q.    Are they complete?

16          A.    Yes.

17          Q.    So there is no reason to believe that you

18    wouldn't have copies of the board minutes for every

19    board meeting, right?

20          A.    Correct.

21          Q.    Has Sawtooth made any changes to the

22    operating agreement since January 1, 2018?

23               MR. ROSA:  Objection on the grounds that

24    it calls for legal conclusion.

25

                                                          39

1     BY MR. BALDWIN:

2          Q.    Ms. Wensink, you can answer.

3          A.    We have an operating agreement.  I don't

4     -- I haven't read it word for word to know if -- what

                      Page 43

Wensink Deborah 070620 ROUGH DRAFT

2   BY MR. BALDWIN:

3       Q.    Okay.

4             I am just asking if Sawtooth has made any

5   changes to your knowledge, has made any changes to any

6   of its governing documents like an operating agreement

7   or articles, that kind of thing.

8       A.    Not to my knowledge.

9       Q.    If they had you would be the one they

10  filed with, right?

11      A.    I would assume that.

12      Q.    Because that's part of your job, right?

13      A.    Yes.

14      Q.    Does Sawtooth still maintain payor

15  contracts with the same insurance providers it did on

16  December of 2018?

17      A.    I don't believe there has been any

18  changes.

19      Q.    Who -- and I am just talking about

20  private pay insurers, who does Sawtooth have payor

21  contracts with?

22      A.    We have Aetna, United Healthcare, Pacific

23  source, select health, Blue Cross, Regents Blue

24  Shield, there is Medicare advantage.  All of those

25  have individual Medicare advantages, but I believe

Page 45

Wensink Deborah 070620 ROUGH DRAFT

8        A.    My vision software, my billing software.

9        Q.    Your vision software is the billing

10   software for southern hide owe ambulatory surgery

11   center?

12       A.    For Sawtooth surgery center, yes.

13       Q.    Well, explain what you mean when you say

14   Sawtooth.  I am talking about Southern Idaho

15   Ambulatory Surgery Center.

16       A.    Because some of the payors want it under

17   southern Idaho, some of the payors want it under The

18   Surgery Center.

19       Q.    Okay.  So some payors still want you to

20   use Southern Idaho Ambulatory Surgery Center, is that

21   right?

22       A.    Yes, because they don't -- yes, because

23   they haven't gotten things transferred and they don't

24   care.

25       Q.    Okay.

47

1        A.    May I --

2        Q.    And you will still do that, you still

3    bill them under southern hide owe ambulatory surgery

4    center like they ask you to?

Page 52

Wensink Deborah 070620 ROUGH DRAFT

5          A.    Yes.

6                THE WITNESS:  May I step away from my

7    desk for a second and get my sweater I am freezing.

8                MR. BALDWIN:  Sure, let's take a

9    five-minute break.

10               VIDEOGRAPHER PIETANZA:  We are going off

11   the record, the time is 12:23 p.m.

12               (Recess taken.)

13               VIDEOGRAPHER PIETANZA:  We are back on

14   the record, the time is 12:35 p.m.

15   BY MR. BALDWIN:

16        Q.    Ms. Wensink, I want to take care of a

17   little housekeeping.  We talked about your subpoena in

18   this case.  I am going to make that Exhibit 1 to your

19   deposition today.  And if you will wait just a second

20   we will pop it up on the screen.  Do you see the

21   subpoena that is marked as Exhibit 1?

22        A.    Yes.

23        Q.    And you said you have read that, right?

24        A.    Yes.

25               MR. BALDWIN:  You can take it down.

48

1    BY MR. BALDWIN:

Page 53

Wensink Deborah 070620 ROUGH DRAFT

89

1    testimony, misstates the document.

2    BY MR. BALDWIN:

3        Q.    Ms. Wensink, is this -- is your answer,

4    your response to Interrogatory No. 4, responsive to

5    the question about what SIASC currently owns in the

6    way of illiquid assets?

7        A.    I don't know what you just asked me.

8        Q.    Okay.  Let me just ask this question.

9    What does SIASC currently own for illiquid assets?

10        A.    I don't know.

11        Q.    How would you find out?

12        A.    I would have to ask Dr. Doble.

13        Q.    You would expect Dr. Doble to know?

14        A.    At least to be able to categorize what

15    you would be talking about.

16        Q.    Would another way be to go around and

17    look and write things down and just say, okay, there

18    is XYZ machine and here is some supplies and just

19    write it all down, would that be a way to do it?

20        A.    Yes and no.

21        Q.    Okay.  Why yes?

22        A.    That would give us an inventory of what

Wensink Deborah 070620 ROUGH DRAFT

23    was exactly here, but what you are talking about SIASC

24    versus The Surgery Center, that's the no.

25              Q.    I didn't ask -- the question doesn't ask

90

1    what The Surgery Center owns, the question asks what

2    does SIASC currently own.  Did SIASC transfer its

3    assets to The Surgery Center or any of them?

4              A.    I don't know.

5              Q.    But in answering this interrogatory you

6    could have found out, right?

7              A.    Probably.

8              Q.    But you didn't do that?

9              A.    No.

10             Q.    Question number five says identify all

11    loans, distributions, or other financial disbursements

12    made by Sawtooth to its members or any of them since

13    January 1, 2018.  And your response is none.  Is that

14    right?

15             A.    Correct.

16             Q.    So you are saying that SIASC has made

17    zero loans, distributions or other financial

18    disbursements to any of its members since January 1,

19    2018?

Page 101

Wensink Deborah 070620 ROUGH DRAFT

11          A.     Yes.

12          Q.     In your deposition on August 23, 2018 you

13   told us on Page 220 that SIASC had a bank account with

14   D.L. Evans, that was in August of 2018.  So the answer

15   to this question, number eight, none, can't be

16   correct, is it?  We will get back to the document.  It

17   popped off the screen for a second.  Number eight it

18   says identify each and every bank account maintained

19   by or for Sawtooth since January 1, 2018.  None is not

20   an honest answer, is it?

21          MR. ROSA:  Objection, misstates the

22   testimony, mischaracterizes the testimony.

23          THE WITNESS:

24   BY MR. BALDWIN:

25          Q.     Ms. Wensink, as you sit here right now

                                                      94

1    you know that SIASC had a bank account in 2018, do you

2    not?

3           A.     Yes.

4           Q.     So did you know that the answer to

5    Interrogatory No. 8 is false, it says that you didn't

6    have one, right?

7           A.     Let me -- I see what you are saying, I

                        Page 105

Wensink Deborah 070620 ROUGH DRAFT

8    hear what you are saying, I guess I should say.  It

9    does -- SIASC does not have an existing bank account,

10   and I believe when I answered that that was what I was

11   thinking.

12              Q.    Okay.  Well, your lawyer certainly knew

13   that when he took this responses to interrogatories

14   and served them on us he certainly knew that that

15   testimony was false because he had been getting paid

16   by checks in 2018, had he not?

17              A.    Yes.

18              MR. ROSA:  Are you testifying?

19              MR. BALDWIN:  I am asking the question.

20              MR. ROSA:  Ask it a different way.

21   BY MR. BALDWIN:

22       Q.    Thank you, but I will ask it like a

23   please?

24              MR. ROSA:  That's fine.

25              MR. BALDWIN:  You ask whatever questions

95

1    you want to whenever I get done.

2              MR. ROSA:  Well.

3              MR. BALDWIN:  Go to interrogatory number

4    nine, please.

Page 106

Wensink Deborah 070620 ROUGH DRAFT

5   BY MR. BALDWIN:

6        Q.    Number nine asks you to identify all

7   persons who have knowledge of Sawtooth, that is

8   SIASC's financial condition since January 1, 2018,

9   including its assets, liabilities, distributions,

10  earnings or expenses.  And you list yourself and Dr.

11  Doble.  Is that a complete answer?

12        A.    I should have put the accountant on

13  there, but I didn't think of it at the time.

14        Q.    Okay.  Is there anybody else that should

15  be added to that list who would have knowledge of

16  SIASC's financial condition since January 1, 2018?

17  Like D.L. Evans, for example.

18        A.    I don't know what D.L. Evans knows.

19        Q.    Is there anybody else that you should

20  have added besides the accountant?  And by the

21  accountant you mean -- I forgot his name, Frank --

22        A.    Yes, Frank Sparr.

23        Q.    Frank Sparr.  Anybody else that should be

24  added to that to make that a complete response like

25  Dr. Kack or the members of the board of directors?

96

1        A.    The rest of the board.

Page 107

Wensink Deborah 070620 ROUGH DRAFT

2      Q.    Anybody else?

3      A.    Not that I can think of.

4      Q.    All right.  Thus far we have knowledge

5  responsive to interrogatory number nine and the board

6  of SIASC would have knowledge responsive to

7  interrogatory nine and the members of SIASC would have

8  knowledge responsive to interrogatory number nine,

9  right?

10      A.    Yes.

11      Q.    Anybody else?

12      A.    Not that I am aware of.

13      Q.    Number ten asks you to identify each

14  person that served as a treasurer or similar position

15  since January 1, 2018 for SIASC and you say yourself.

16  Were you a treasurer or are you answering that you

17  were in a similar position?

18      A.    Similar position.

19      Q.    Did anybody else serve as a treasurer or

20  similar position at SIASC since January 1, 2018?

21      A.    Not that I know of.

22      Q.    You say discovery is ongoing, who are you

23  going to ask?

24      A.    I might ask Angelo what you were trying

25  to -- what I was missing.  I don't know -- I didn't

Page 108

Wensink Deborah 070620 ROUGH DRAFT

20    let me rephrase that.  Asks SIASC to identify each

21    person or entity who held membership interests in

22    Sawtooth at any point since January 1, 2018 but is no

23    longer a member of Sawtooth.  And your answer to that

24    is none.  Do you see that?

25           A.    Yes.


                                                           99


 1           Q.    So you told me at the beginning of this,

 2    and told me in the arbitration proceedings, who the

 3    members of SIASC were, they included, for example, Dr.

 4    Doble, Dr. Kack and others, in the spring and fall

 5    of 2018 at least, and you told me in the preceding

 6    interrogatory that The Surgery Center PLLC is now the

 7    100% owner.  If those things are true then you would

 8    agree with me that there are in fact persons or

 9    entities who previously held interests in Sawtooth

10    that are no longer members, right?

11           A.    Would I agree to that, no, because it is

12    very confusing and I would need to see some -- it is

13    confusing, so, no, I won't agree with that.

14           Q.    Okay.  What would you need to see?

15           A.    Something that explained it to me.

16           Q.    Did you look for something that explained

                          Page 111

Wensink Deborah 070620 ROUGH DRAFT

17      it to you?

18              A.      No.

19              Q.      You just said none, is that right?

20              A.      Yes.  But I thought you were asking was

21      physicians who might be owners that have left, none.

22              Q.      I am asking for any person or entity who

23      used to have a membership interest in Sawtooth since

24      January 1, 2018 that is no longer a member of Sawtooth

25      as though of the date of the interrogatories, that

100

1      would be, for example, Dr. Doble, right?

2              A.      You have me very confused now, no, I

3      won't say right.

4              Q.      Okay.  Number 14, identify each person

5      who has served as an accountant, auditor or bookkeeper

6      for Sawtooth since January 1, 2018.  You understand

7      that question?

8              A.      Yes.  Well, except that it is Sawtooth,

9      so there we go again.

10              Q.      Okay.  So who served as an accountant

11      auditor or bookkeeper for Sawtooth, I don't care how

12      you define Sawtooth, it is defined as SIASC, but who

13      are the accountants, bookkeepers or auditors for

Wensink Deborah 070620 ROUGH DRAFT

14   either entity.

15        A.    Bookkeeper is me, accountant is Frank

16   Sparr.

17        Q.    All right.  Now let's narrow it down a

18   little bit.  Which entity are you the bookkeeper for?

19        A.    TSC.

20        Q.    What about SIASC, I thought you were the

21   bookkeeper for them, too.

22        A.    I was, but in my brain they don't exist

23   any longer is what I have told you.

24        Q.    I understand that, but you can read the

25   -- the question says since January 1, 2018, do you

                                                      101

1   understand that, you understand that they existed in

2   2018, right?

3        A.    Yes.

4        Q.    Okay.  All right.  And you were a

5   bookkeeper for them since 2018.

6        A.    Yes, I was.

7        Q.    And Mr. Sparr was an accountant for SIASC

8   since January 1, 2018, right?

9        A.    Yes.

10        Q.    Who were the auditors, did Mr. Sparr's

Wensink Deborah 070620 ROUGH DRAFT

105

1    Sawtooth is SIASC as defined in this document.  So,

2    for example, SIASC would have had a lease agreement,

3        right?

4            A.    Yes.

5            Q.    And SIASC to the extent it transferred

6    it's interests in the surgery -- the ASC to TSC would

7    have had some type of transfer of documents, right?

8            A.    I don't -- I don't know.

9            Q.    Okay.

10           Q.    Where did you look -- what did you do to

11   try to determine, if anything, what contracts SIASC

12   had since January 1, 2018?

13           A.    I would have looked in my files, but,

14   again, we have Sawtooth to me means something

15   different than Sawtooth to you.

16           Q.    Okay.  You would have looked at your

17   files.  Did you in fact look in your files?

18           A.    Yes, some.

19           Q.    Which files did you look in?

20           A.    The ones in the drawers here beside me.

21           Q.    Where are these files in your office?

22           A.    In the office across the hall.

Wensink Deborah 070620 ROUGH DRAFT

23          Q.     Did you look to see if SIASC had a

24    current operating agreement?

25          A.     No, because in my mind SIASC doesn't

106

1    exist anymore.

2          Q.     Did you look for agreements entered into

3    between the members of SIASC?

4          A.     No.

5          Q.     Did you look for state and federal tax

6    returns filed by SIASC since January 1, 2018?

7          A.     Yes, because I originally said no because

8    there weren't any, I didn't think.  And I don't

9    recall, I think it was -- I don't recall who told me

10   yes there were some files, so I dug into the stuff

11   Frank had given me after I had done that, after I had

12   done this.

13         Q.     And when you found those did that help

14   you with the understanding about whether SIASC existed

15   or not?

16         A.     No, because I thought it was just taking

17   care of finishing up that year.

18         Q.     What year?

19         A.     17 and 18.

Wensink Deborah 070620 ROUGH DRAFT

14   Sawtooth's SIASC's assets.  I will move on.  Do you

15   have any documents that reflect in any way the sale or

16   disposition of SIASC's assets?

17          A.    No.

18          Q.    So what you are telling me, if I

19   understand correctly, and I do want to get this right

20   so let me just make sure, what you are telling me is

21   TSC owns everything now, right, today?

22          A.    Yes, I guess so.

23          Q.    And before TSC SIASC owned whatever

24   assets it had, equipment, supplies, leasehold

25   interests, those sorts of things, right?

                                                    109

1          A.    Yes.

2          Q.    So if SIASC used to own and TSC now owns

3   them would you expect there to be some kind of

4   document memorializing the transfer of those assets

5   from one entity to the other?

6          A.    That was something the board would have

7   taken care of, I assume.  I didn't -- I am not party

8   to any of that.

9          Q.    Okay.  Well, are you party to responding

10  to these discovery requests on behalf of SIASC?

# Attachment B

# Transcript of Arbitration Hearing

Date: September 6 and 7, 2018

Case: Southern Idaho Ambulatory Surgery Center, LLC vs. Twin Falls NSC, LLC

AAA Case No: 01-18-0002-5082



ASSOCIATED REPORTING & VIDEO

The Owyhee
1109 Main Street, Suite 220
Boise, Idaho 83702

Phone: (208) 343-4004
Facsimile: (208) 343-4002
production@arvboise.com
arvboise.com

Page 46

1  Dr. Peter Doble.
2       JUDGE ALBRECHT:  Dr. Doble, if you would,
3  please, take the witness stand.
4
5          H. PETER DOBLE II, M.D.,
6  a witness having been first duly sworn to tell the
7  truth, the whole truth and nothing but the truth,
8  was examined and testified as follows:
9       JUDGE ALBRECHT:  You may proceed.
10      MR. ROSA:  Thank you, Your Honor.
11
12          DIRECT EXAMINATION
13  BY MR. ROSA:
14      Q.  Dr. Doble, you are a member of Southern
15  Idaho Ambulatory Surgery Center at this moment in
16  time.
17          Is that correct?
18      A.  That is.
19      Q.  You're the manager?
20      A.  I am.
21      Q.  All right.  Now, you gave deposition
22  testimony in this case.
23          Do you recall that?
24      A.  I do.
25      Q.  All right.  And have you reviewed your

Page 47

1  deposition testimony?
2      A.  I have.
3      Q.  And did you make any substantive
4  corrections to your testimony?
5      A.  No.  I made several spelling changes.
6      Q.  Okay.  And those have been submitted to
7  the court reporter, correct?
8      A.  I believe that's true.
9      Q.  All right.  And to the best of your
10  knowledge, is the testimony that you did give --
11  aside from the minor corrections you have just
12  identified in general, is that testimony true and
13  correct?
14      A.  I believe it is.
15      Q.  All right.  Very good.
16          Doctor, I want to focus your attention
17  on a few things.  We'll take them one at a time.
18          The first relates to --
19      JUDGE ALBRECHT:  Can I ask you before we go
20  any farther, with regard to the depositions, you
21  made reference to the deposition testimony of both
22  Dr. Doble and Dr. Kack, and I've been provided with
23  the originals of a number of depositions.
24          With regard to this matter, am I to
25  review as evidence in this hearing all of these

Page 48

1  depositions, the depositions of Dr. Doble and
2  Dr. Kack or other witnesses?  Or is there some
3  understanding with regard to these depositions?
4      MR. ROSA:  Your Honor, the parties have not
5  discussed that.
6      JUDGE ALBRECHT:  Okay.  Fine.  Then I don't
7  have any further questions if there's been no
8  agreement to that.
9      MR. BALDWIN:  There has not, Your Honor.
10      JUDGE ALBRECHT:  All right.  I will not
11  review the depositions then.  Thank you.
12      Q.  (BY MR. ROSA)  Doctor, did you
13  participate in the business transaction involving
14  Sawtooth and National Surgical Care with respect to
15  NSC, as I will refer to them, acquiring a
16  controlling interest in Sawtooth back in 2007?
17      A.  Yes.
18      Q.  All right.  And what was the extent of
19  your participation?
20      A.  I'm sorry.  My participation?
21      Q.  Correct.
22      A.  I was the appointed lead negotiator for
23  the entity that was Sawtooth at the time.
24      Q.  Okay.  And are you aware of any
25  motivations that Sawtooth had for entering into a

Page 49

1  transaction with NSC?
2      A.  The physician partners felt that with
3  respect to the changing climate in the ambulatory
4  surgery center world that having a larger partner
5  was of benefit, and we sought one out.
6      Q.  What specific benefits did Sawtooth have
7  in mind in entering into such a partnership?
8      A.  Sawtooth was interested in acquiring a
9  more robust management team that we believed a
10  national larger partner could benefit.
11          We wished to participate in a larger
12  buying group.  We wished to participate in a larger
13  group for health insurance and employee benefits.
14      Q.  And did NSC assure Sawtooth that it
15  would bring those benefits to the table if it were
16  to acquire a controlling interest in Sawtooth?
17      A.  That was one of the assurances, yes.
18      Q.  All right.  What other assurances were
19  made to Sawtooth by NSC in anticipation of the
20  deal?
21      A.  NSC believed that they could help the
22  surgery center grow and develop and have a more
23  secure footing with respect to our concern for
24  St. Luke's growing impact on the environment and
25  assist with growth and development of the center's